## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**ROBERT LEE WILLIAMS, IV,**
**0-753945**

       **Petitioner,**

**vs.**                                    **Cause No. 4:03cv264-SPM/AK**

**JAMES V. CROSBY, as Secretary,**
**Department of Corrections,**
**State of Florida**

       **Respondent.**
_____/


## REPORT AND RECOMMENDATION

This cause is before the Court on Petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2254.  Doc. 1.  Petitioner has paid the filing fee.  Respondent has filed his answer, Doc. 6, and Petitioner has filed a reply.  Doc. 7.  This matter is therefore in a posture for decision.  Having carefully considered the issues raised, the Court recommends that the petition be granted, and the State be ordered to retry Petitioner.

## BACKGROUND

In September, 1998, Petitioner was convicted by a jury of DUI manslaughter and DUI causing serious bodily injury.  Doc. 1 at 1.  After remand from the appellate court, he was

sentenced to 180 months and 15.9 months imprisonment, to run consecutively. *Id.* Petitioner

filed a Rule 3.850 motion for post-conviction relief based on the following: (1) ineffective

assistance of counsel for failure properly to challenge the blood alcohol draw evidence, and (2)

ineffective assistance of counsel for failure to advise the trial judge of contact between a juror

and a member of Petitioner's family.  Doc. 1, Memorandum at 3.  The court summarily denied

the petition, which was affirmed on appeal. *Id.*  This petition ensued.  On this occasion,

Petitioner advances the two ineffective assistance of counsel claims which were raised on post-

conviction.  The pertinent facts follow.

Petitioner was charged with DUI manslaughter and DUI with serious bodily injury after

he was involved in an automobile accident with another vehicle in January, 1996.  Doc. 6, Ex. A.

The report from the Florida Highway Patrol stated that Petitioner had a blood alcohol level of

0.23.  *Id.*  Before trial, Petitioner filed a motion to suppress the results of the blood test on the

ground "that there were no objective facts to support the requisite probable cause" for the blood

draw.  *Id.* at Ex. B.  In arguing the motion, Petitioner's trial counsel explained:

> I would just elaborate on this written motion to point out that Corporal Johnson
> stated that he arrived...approximately an hour after the accident had occurred,
> that...it took approximately 30 minutes after he arrived, 30 minutes to an hour, to
> extricate the injured survivor who was transported by helicopter to TMH.
>
> [H]e spoke to [the defendant ] he said from 10 to 15 minutes during this period of
> time before the defendant was transported to TMH; that the defendant at the time
> he spoke to him was sitting on the bumper to the ambulance or emergency
> vehicle; that he asked the defendant what happened and he told him basically
> what had happened as far as he knew.
>
> Officer Johnson at his deposition...testified that he smelled alcohol on the
> defendant and that he observed bloodshot eyes.

[B]ased on this, he's done no investigation of the accident at that time because he testified that he spent three and a half to four hours at the scene investigating the accident.

His investigation report was not filed until some three months, four months later, and obviously after that period of time he's not only had the blood taken and tested, but he's also interviewed the defendant at the hospital some four or five hours after he arrived at the scene.  He went to TMH and interviewed the defendant.

And...there's no...factual basis for him to make a determination that the defendant should have his blood taken which was done at TMH by an officer with the Florida Highway Patrol that Trooper Johnson called ahead and asked him to go there and take the blood sample.

There...were emergency persons on the ambulance and he could have–why didn't he tell them to take the test when they got him to the hospital?  But he calls in to the department and tells them to do it.  This appears to be an afterthought.

And he had not investigated the accident.  He couldn't tell what had happened....[U]nder the statute, in order for the defendant to have to submit to the blood test, then there would have to have been reasonable cause to believe that he was impaired from alcohol and that he in fact caused the accident....There's no way that Officer Johnson could have known that without just guesswork.

*Id*. at Ex. C, 7-9.

The court denied the motion, stating:

[W]hat you've got is the trooper at the scene long enough to have made at least a preliminary investigation, his personal observation of the defendant where the defendant's eyes were bloodshot and the odor of alcohol was on him, and the conversation with the defendant I would assume indicated that the defendant was the driver of the vehicle that struck the rear of the first vehicle.

* * *

I think the fact that he observed the defendant with bloodshot eyes and with the odor of alcohol on him and the defendant advised him that he was driving the car that struck the other car in the rear is sufficient to establish probable cause for him to take a blood test and I'll deny the motion.

*Id*. at 11-13.

The case then proceeded to trial.  At trial, the State presented the testimony of Corporal Virginia Johnson, who was a traffic homicide investigator for the Florida Highway Patrol at the time of the accident.  *Id*. at Ex. D, 76.  Corporal Johnson testified that he was called to the scene of the accident at 5:27 a.m. on January 8, 1996, and arrived on the scene at 6:15 a.m.  *Id*. at 78.  During the course of his investigation, Corporal Johnson collected "three empty beer cans and one empty beer can that's in some type of container and there [were] nine full cans."  *Id*. at 85.  At the scene, he talked to Petitioner, who advised Johnson that he was the driver of the second truck.  *Id*. at 88.  Corporal Johnson testified that Petitioner's "eyes were bloodshot and there was a moderate to high odor of alcoholic beverages coming from his person and about his breath.  He also had some minor facial and head injuries."  *Id*. at 89-90.  At that time, Johnson did not have Petitioner perform any roadside tests because he was concerned about his medical condition.  *Id*. at 90.  Johnson did, however, request "the dispatcher out of Tallahassee to have an area trooper that was on duty to go by the hospital and meet them at the hospital and draw some blood [from Petitioner]" to "determine whether he had consumed any alcoholic beverages or drugs or anything like that."  *Id*.  "[B]ased on the fact of what [he] received from [Petitioner] and based on what [he] recovered from his vehicle," Johnson stated that in his opinion, Petitioner "was intoxicated at the time."  *Id*. at 90-91.

After completing the scene investigation, Corporal Johnson went to the hospital to interview Petitioner.  *Id*. at Ex. E, 137-38.  At that time, Petitioner was Mirandized by the other investigating officer, Corporal Peter Bucher, and he consented to an interview.  *Id*. at 139.

Corporal Bucher testified next.  He stated that after conferring with Johnson and seeing

evidence of alcohol use at the scene, they requested a blood draw from Petitioner.  *Id*. at 160-61.

After securing the scene, Corporal Bucher also went to the hospital to interview Petitioner.  *Id*. at

162.  After being assured by medical personnel that Petitioner could be interviewed, Bucher

advised Petitioner of his *Miranda* rights.  *Id*. at 163.  According to Corporal Bucher, Petitioner

appeared to understand his rights and there was no force, threat, or coercion used to obtain the

tape-recorded statement.  *Id*.  On the tape, the following pertinent exchange occurred:

CORPORAL BUCHER:   There were signs of alcohol in your vehicle and around your vehicle and about your person.  Were you drinking earlier?

THE DEFENDANT:   The cooler and everything in there in the toolbox and all of that has been there.  Earlier today, a lot earlier today, I had had a few drinks.

CORPORAL BUCHER:   Okay.  What do you mean by a lot earlier?

\* \* \*

THE DEFENDANT:   Time-wise probably before 8:00, 9:00, 10:00....

CORPORAL BUCHER:   The day before?

THE DEFENDANT:   I'm not going to lie to you and tell you I didn't have a beer on the way down here because I did....

\* \* \*

THE DEFENDANT:   I'm here admitting to something that I really shouldn't be doing, but there's no sense in lying about it.  I don't feel that I was intoxicated, you know, .08, you know is mighty minute.

CORPORAL JOHNSON:   How many beers did you drink on the way [back to Tallahassee]?

* * *

THE DEFENDANT:          No more than two.

CORPORAL BUCHER:        What type of beer were you drinking or what were
                        you drinking?  Whether it was beer, I don't know.
                        What were you drinking?

THE DEFENDANT:          Busch Light.

* * *

CORPORAL JOHNSON:       Where did you get them from?  Where did you buy
                        them?

CORPORAL BUCHER:        In Sarasota?

THE DEFENDANT:          I probably go them out of our refrigerator.  I don't
                        know where exactly I bought them.  I don't know.

CORPORAL JOHNSON:       I was asking if you bought them on the way down
                        or if you had them when you left Sarasota.  Did you
                        have them with you when you left?

THE DEFENDANT:          Yeah.  I didn't stop and buy any, no, and there were
                        a couple that had been in there.

CORPORAL BUCHER:        What time do you remember that you stopped
                        drinking, that you finished your last one?  Do you
                        remember?  Or were you sipping it at about the time
                        that this happened?

THE DEFENDANT:          No.  I didn't have one when it happened.

* * *

THE DEFENDANT:          I hadn't had more than two beers between Sarasota
                        and Tallahassee and that's a five hour ride.

* * *

CORPORAL BUCHER:        Okay.  The evening before[,] where were
                        you...when you were drinking?  The evening before.
                        I'm not talking about...coming up the road.

THE DEFENDANT: The evening before?  The evening before?

CORPORAL BUCHER: Well, you said–I'm talking about–this is the morning, right?

THE DEFENDANT: Yes, sir.

CORPORAL BUCHER: This is Monday morning, right?  So you're talking about Sunday evening.  You said that you were–

THE DEFENDANT: I was at my brother's house watching a football game on channel 36.  I was watching the Colts.

\* \* \*

CORPORAL BUCHER: Okay.  So what time did you–let's just say you were at your brother's now.  What time did you start drinking?

THE DEFENDANT: I think it came on at 3:00.

CORPORAL BUCHER: So what time did you stop drinking, when the game was over?

THE DEFENDANT: Probably.

CORPORAL BUCHER: And then what did you do after that?

THE DEFENDANT: Went home.

\* \* \*

THE DEFENDANT: Turned the TV on.  I don't believe I really drank any more after that.  I got something to eat.

CORPORAL BUCHER: And then you left at what time to come up here to Tallahassee did you say?

THE DEFENDANT: Approximately 1:00 a.m.

*Id*. at 170-74.

According to Corporal Bucher, Trooper Seymour obtained Petitioner's blood draw and then "brought that to the scene right after he obtained it....He brought it to us.  We were still at

the scene and I took it from his custody and secured it until the time that I left it at the lab shortly

after we left the hospital." *Id*. at 181.

On cross-examination, Corporal Bucher testified that Petitioner's blood was drawn in the

presence of Trooper Seymour at 7:55 a.m., that he received the blood draw kit from Trooper

Seymour at the accident scene at 8:30 a.m., and that he "went to the crime lab in Tallahassee and

dropped the blood kit off there" after he left the interview with Petitioner, which terminated at

12:07 p.m. *Id*. at 183-86.  The crime lab returned the kit to the patrol station in Madison,

Florida, in February, 1996, where it was kept on a shelf in the evidence and property room, until

Trooper Bucher retrieved it for trial.  *Id*. at 185-87.  During that time period, the kit was not

refrigerated.  *Id*. at 188.  In fact, the kit was never refrigerated:

> Q     [W]henever Seymour picked [the kit] up from the lab at the hospital and
>       brought it to you out in the field and then you carried it from the field back
>       to the hospital and then back to the crime lab, it wasn't refrigerated then
>       either, was it?
>
> A     Not other than what the weather refrigerated.
>
> Q     Well, you didn't leave it outside, did you?
>
> A     Well, no, but it was in my car and it was cool.

*Id*.

The State next tendered Dale Livingston, a toxicologist with the Florida Department of

Law Enforcement crime laboratory, as an expert in the field of forensic alcohol toxicology.  *Id*.

at 195-98.  At the outset, Livingston noted certain date on the blood draw kit, including

Petitioner's name, the date and the time of the accident--January 8, 1996 at 5:25 a.m.–and the

date and time that the blood was drawn–"1/8/95 and the time is 7:50 a.m." *Id*. at 201.  Despite

the year discrepancy, Livingston testified that the blood "looked real typical, a normal blood

sample, a couple of weeks old, three weeks old." *Id.* at 202-03.  When he analyzed the blood,

Livingston found "that the blood...contained 0.23 percent of ethyl alcohol by weight, or another

way to express that is 0.23 grams of ethyl alcohol per hundred milliliters of blood." *Id.* at 205.

Livingston then explained how to calculate "the relationship between the concentration of

alcohol in a person's blood and the total amount of alcohol that's in their body":

> For an individual of...average weight like you're saying, 150, 160 pounds, one
> drink, and if we define a drink as the quantity of alcohol in a 12 ounce can of four
> percent beer, you're looking at raising the blood alcohol concentration
> somewhere between .02 and .03 percent.

*Id.* at 212.  Then, the

> alcohol is absorbed from the stomach into the bloodstream and then your body
> essentially starts to rid itself of the alcohol right away.  The alcohol passes
> through the liver where it's metabolized and part of it's excreted in the urine and
> some of it's excreted in the breath...buth then the body starts to rid itself of that
> alcohol.
>
> It turns out that alcohol pretty much has a...constant rate of elimination, and it
> varies between individuals.

*Id.*  According to Livingston, the "average rate of elimination is usually stated to be about .018

grams percent per hour with a range of between .01 percent per hour up to a high of about .025

percent per hour."  *Id.* at 213.  In his opinion,

> The effect of alcohol on any individual at a blood alcohol concentration of 0.23
> percent...would cause significant impairment in that person's ability to safely
> operate a car....I don't think anyone could safely operate a motor vehicle with a
> blood alcohol concentration of .23 percent.

*Id.* at 215.

At the conclusion of the State's case in chief, Petitioner's counsel moved for judgment of

acquittal "based on the fact that the State has failed to carry their burden of establishing under

316.1933(c)(3) that [Petitioner] was under the influence of an alcoholic beverage to the extent

that his normal faculties were impaired at the time that the accident occurred." *Id.* at 232. The court overruled the motion, finding that "there's been sufficient testimony for this to be a question that has to be determined by the jury...." *Id.* at 233.

Petitioner began his defense by calling Dr. Ricky Bateh, an attorney with a Ph.D. in analytical chemistry, who was qualified as an expert in toxicology. *Id.* at 235-36 & 238. Dr. Bateh testified that the blood draw kit looked "like...the type of collection kit that's used" and that he "could [test] the blood samples [himself] if the tubes were preserved meaning refrigerated and/or kept at refrigeration temperature for the period of time that one can verify that you're able to analyze the blood sample over a certain period of time." *Id.* at 239. However, "Forensically if the samples were not refrigerated, they would not be considered a preserved sample." *Id.* at 240. Dr. Bateh questioned the protocol used in the blood draw, noting (1) a failure to "have two different kits" so that "kit number two, that's preserved for...retesting if there's a [reliability] question," (2) a failure to perform blood analyses on both tubes of Petitioner's blood, rather than drawing two samples from one tube, and (3) a failure to seal the tubes in the blood draw kit to prevent tampering. *Id.* at 243-44. Counsel then posed the following:

> Q. Okay. Now, let me ask you a hypothetical. If this blood sample was taken at 7:55 a.m. on January the 8th, 1996, and was received...by a state trooper at that time....Then he transferred it to another state trooper at 8:30 a.m. at a location some twenty something miles from the hospital. Then that trooper...put it in his car and he retains it until 12:06 p.m. at which time he turns it over to the FDLE crime lab.
>
> [I]s there anything wrong with that?
>
> A Generally speaking, for blood alcohol analyses, once you collect the sample, it's preferable to have it refrigerated as soon as possible.
>
> Q Why is that?

A        Because once the blood is collected, there are a variety of conditions that may cause the alcohol level to either increase or decrease, and by refrigerating the sample, you would minimize the increase or the decrease based upon the materials that are in the tube and how they interact with the blood sample that's collected.

Q        Okay.  So, in other words, the temperature that the sample is kept in could affect the validity of it or the increase or decrease of what it would read; is that correct?

A        That's correct.

*Id.* at 245-46.

    After being additionally accepted as an expert in pharmacology, Dr. Bateh was

questioned further:

Q        A person that is 5'7" and approximately 140 to 145 pounds, has his blood extracted for purposes of running this [chromatogram]?

A        Chromatogram.

Q        Chromatogram.  And the blood is extracted some three hours after the accident.  Would you have an opinion as to whether or not that person would be acting normal or not or would be impaired to the extent that he couldn't talk and walk and do the things that normal people can do when they're sober?

A        Generally speaking, an alcohol level of a .23 some three hours after a point in question presuming that no alcohol was ingested between the time of interest versus when the blood sample was collected...then the alcohol level at the time in the past would have been higher than the time that it was collected.

         An approximately three hour time lapse between the incident in question versus the collection could bring the alcohol level up to a 0.26.  A 0.26 is a very high alcohol level.  It's approximately three times more than what is considered to be under the influence in the State of Florida.  The State of Florida uses a 0.08.

         And in most cases one observes the effects of alcohol generally anywhere between 0.05 and 0.1.  A person becomes let's say more sociable.  They may...laugh a little bit more, may be more

talkative.  Their eyes may not focus as well as if alcohol were not present.

From .1 to .15 those characteristics become more exaggerated. Some people...even act completely different when they are at that alcohol level.  For instance, a calm person may be very agitated and on the other hand an agitated person without alcohol may have alcohol serve as a calming effect.

If you then increase above a .15, alcohol has a much more severe impact on the body where both your fine motor skills and gross motor skills are affected....That's between .15 and .2.

Above .2, the effects of alcohol even become more exaggerated for the gross motor skills and you pretty much lose all fine motor skills.  So a person that would be with an alcohol level of a .2 and above would exhibit...grossly slurred speech, stumbling, fumbling around....

Above .3 you would start approaching a very dangerous alcohol level in which some of your body functions start to slow down and sometimes even stop depending upon the person.

*Id*. at 249-51.

Finally, Dr. Bateh opined:

Q     Based on the information I have provided to you in the hypothetical where the accident was discovered between 5:00 and 5:15 in the morning and then the testing, how that was addressed, and then the process of the taking of blood, how it was handled, and then the testing of the blood, and further that...there has been no testimony or there's no evidence that [Petitioner] had any effects other than an odor of alcohol about his person and bloodshot eyes, can you base an opinion as to the reliability of this reading?  Would that be consistent with his actions?

A     If there was no testimony that [Petitioner] was exhibiting effects of alcohol, then my opinion would be that a 0.23 some three hours later is not consistent with a person not exhibiting any effects of alcohol.

*Id*. at 253.

Petitioner testified on his own behalf, advising the jury that he had three beers the night

before the accident; that, although he had two or three additional beers in the time leading up to

the accident, he was not drinking immediately before the wreck; and that the beers found at the scene had been in his toolbox.  *Id*. at 276-78.  He absolutely denied being impaired at the time of the accident.  *Id*. at 290.

On cross-examination, Petitioner clarified that he had six beers between 1:00 p.m. and 5:00 a.m.  *Id*. at 292.  He denied being a "dedicated drinker."  *Id*. at 297.

At the conclusion of the evidence, Petitioner's counsel renewed the motion for judgment of acquittal, which was denied.  *Id*. at 302.

In closing arguments, the State concluded with the following:

> If he's not a dedicated drinker, if he's not one to really party a lot, a man who has his own brand, why was he drinking beer between 1:00 and 5:00 on a Monday morning, drinking Busch Light beer just like he said on the tape, two or three or four?  That man was intoxicated.  That man was intoxicated from the day before and he was just topping off the tank.

*Id*. at 312.

Petitioner counsel's countered:

> And I just submit to you that the State has woefully failed to prove above and beyond a reasonable doubt that [Petitioner] was, number one, intoxicated, number two, that his blood alcohol was above .1, and that he was involved in the accident and was the cause of the accident....

*Id*. at 322.

In instructing the jury, the court stated:

> With regard to Count I, before you can find the defendant guilty of manslaughter by driving under the influence, the State must prove the following three elements beyond a reasonable doubt: One, that the defendant...operated a vehicle; two, that the defendant by reason of such operation caused or contributed to the cause of the death of [the decedent]; three, at the time of such operation the defendant was under the influence of alcoholic beverages to the extent that his normal faculties were impaired, or had a blood alcohol level of 0.08 percent or higher.

* * *

> If you find from the evidence that the defendant had a blood or a breath alcohol level of 0.05 percent or less, you shall presume that the defendant was not under the influence of alcoholic beverages to the extent that his normal faculties were impaired.
>
> If you find from the evidence that the defendant had a blood or an alcohol level in excess of 0.05 percent but less than 0.08 percent, you may consider that evidence with other competent evidence in determining whether the defendant was under the influence of alcoholic beverages to the extent that his normal faculties were impaired.
>
> If you find from the evidence that the defendant had a blood or breath alcohol level of 0.08 percent or more, that evidence would be sufficient by itself to establish that the defendant was under the influence of alcohol to the extent that his normal faculties were impaired.
>
> However, such evidence may be contradicted or rebutted by other evidence. These presumptions may be considered along with any other evidence presented in deciding whether the defendant was under the influence of alcoholic beverages to the extent that his normal faculties were impaired.

*Id.* at 328-30.  The jury was instructed that the "same presumptions apply in [Count II] as applied in the first count.  *Id.* at 332.  Petitioner's counsel agreed to these instructions.  *Id.* at 342.

The jury deliberated for approximately thirty minutes before returning guilty verdicts on both counts.  *Id.* at 343-44; Doc. 6, Ex. G.  Petitioner was subsequently sentenced to 180 months imprisonment on the conviction for DUI manslaughter and 60 months imprisonment on the conviction for DUI causing serious bodily injury, to run consecutively.  Doc. 6, Ex. H.

Petitioner appealed his sentence.  *Williams v. State*, 769 So.2d 403, 404 (Fla. D. Ct. App. 2000).  The appellate court remanded the case to the trial court "for its determination of whether [Petitioner's] sentences could have been imposed under the 1994 guidelines, without an upward departure."  *Id.*  On December 11, 2000, he was resentenced to 180 months on the manslaughter conviction and 15.9 months on the bodily injury conviction, to run consecutively.  Doc. 1 at 1.

Petitioner then filed a timely motion for post-conviction relief in state court.  Doc. 6 at

Ex. N.  In that motion, he raised two claims of ineffective assistance of counsel.  *Id*. at 5-6.  In

the first, Petitioner argued:

> [Petitioner] received constitutionally ineffective assistance of counsel due to the failure of counsel to properly challenge the results of the blood draw ordered by law enforcement officers....Had counsel properly challenged the blood draw evidence based on non-compliance with the statutory mandate for reliable procedures and administrative rules, the state would not have been entitled to the statutory presumption of impairment upon which the state exclusively relied to support its theory of prosecution.  No alternative, independent evidence of impairment was introduced at trial.  Had counsel properly challenged the blood evidence, the state would not have been able to prove that [Petitioner's] faculties were impaired beyond a reasonable doubt....But for the deficient performance rendered by counsel, [Petitioner] would have been acquitted.

*Id*.

In the second claim for relief, Petitioner maintained:

> Trial counsel...rendered ineffective assistance by failing to advise the Court upon learning that a juror had improperly made verbal contact with members of [Petitioner's] family during a break from the trial proceedings. [Counsel] was made aware of the improper contact immediately following its occurrence, and his failure to advise the Court undermines any confidence in the resulting verdicts tendered by the jury. [Counsel], as an officer of the court, was obligated to inform the court when jurors engaged in the type of misconduct displayed during the trial....In turn, the trial court would have been obliged to conduct an on-the-record inquiry of the juror to determine whether the trial had been compromised by the juror misconduct.  Upon such a finding, [Petitioner] would have been entitled to a mistrial.  Because [counsel] knowingly failed to protect the rights of [Petitioner] by neglecting to advise the Court of juror misconduct, [Petitioner] was denied the effective assistance of counsel.  Absent the proper inquiry from the trial court to which [Petitioner] was entitled, it is submitted that [Petitioner] was denied his right to a fair trial by an impartial jury.

*Id*. at 6.

The court denied the motion, finding:

> Defendant has failed to conclusively demonstrate that trial counsel...was ineffective for failure to challenge the admission of Defendant's blood sample in a particularized legal strategy and neglecting to inform the court of a jury taint.

[Counsel] properly challenged the admission of Defendant's blood sample through pre-trial motion and cannot be labeled ineffective after failing to prevail. Next, Defendant, with full knowledge of contact between his family and a juror, chose not to bring the potential taint to the court's attention until after the bias did not favor his side; therefore, he may not make issue of it afterward.

Not only has Defendant failed to demonstrate that an evidentiary hearing is warranted, the underlying assertions are matters to be heard on direct appeal and may not be subsequently placed at issue through collateral attack under Florida Rule of Criminal Procedure 3.850.

Doc. 6, Ex. O (citations omitted).

Petitioner appealed the decision on the ground that the court erred in denying his motion without evidentiary hearing.  Doc. 6, Ex. P.  The court of appeal affirmed without written decision.  Doc. 6, Ex. Q.  The instant petition ensued.

On this occasion, Petitioner raises the identical claims of ineffectiveness raised in the post-conviction motion.  Doc. 1 at 6-7.  According to Petitioner,

The specific grounds of ineffective assistance of counsel alleged by Petitioner...involve (1) the failure to properly challenge the blood alcohol draw evidence, as the scientific reliability of the evidence was compromised by handling of the blood kit and blood samples and (2) the failure to advise the trial judge of improper jury contact between one of the jurors and Petitioner['s] family (juror commented he had a close family member in jail and there was nothing to worry about).

Doc. 1, Memorandum at 19.

Respondent concedes that Petitioner has "exhausted or technically exhausted available state remedies at this time."   Doc. 6 at 2.  He denies, however, that Petitioner is entitled to any relief.

**DISCUSSION**

Under 28 U.S.C. § 2254, a federal court may grant habeas corpus relief only if the state court adjudication

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "A state-court decision will certainly be contrary to...clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. A state-court decision will also be contrary to clearly established Supreme Court precedent "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Id*. at 406.

Under the "unreasonable application" clause of § 2254(d), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The federal court considering a habeas petition "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 412.

Further, in reviewing the decision of the state court, this Court must presume that the state court's factual determinations are correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The fact that the state court did not write "an opinion that explains the state court's rationale," does not detract from the deference owed to that court's decision.  *Wright v. Secretary for the Department of Corrections*, 278 F.3d 1245,1255 (11th Cir. 2002).

Because both of Petitioner's claims involve allegations that his counsel was ineffective, a consideration of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.  *Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.  The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not

sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the

outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

I.       Failure properly to challenge the blood alcohol draw evidence.

In his first ground for relief, Petitioner claims that the "evidence adduced at trial illustrates that the blood evidence introduced against Petitioner Williams was not obtained in accordance with the core policies of the [Florida] implied consent law...." Doc. 1, Memorandum at 19. Thus, because the "integrity and reliability of the blood purported to have been drawn from Petitioner Williams...was compromised," the State should not have been "entitled to the presumption of impairment authorized under [the statute]."[1] *Id*. In Defendant's estimation,

---

[1]The presumption statute states:

> At the trial of any...criminal action...arising out of acts alleged to have been committed by any person while driving, or in actual physical control of, a vehicle while under the influence of alcoholic beverages...when affected to the extent that the person's normal faculties were impaired or to the extent that he...was deprived of full possession of his...normal faculties, the results of any test administered in accordance with § 316.1932 or § 316.1933 and this section are admissible into evidence when otherwise admissible, and the amount of alcohol in the person's blood or breath at the time alleged, as shown by chemical analysis of the person's blood...gives rise to the following presumptions:

> * * *

counsel was ineffective for failing to challenge this aspect of the blood draw and the State's right to the presumption instruction.

According to Respondent, the state court "considered the same argument...and found that there was no deficient performance and no prejudice" which " was not an unreasonable application of established federal law."  Doc. 6 at 9.

Petitioner did indeed present this identical argument to the state court on post-conviction. Doc. 6, Ex. N at 5.  This is important because if the state court failed to resolve the merits of this claim, "the present controversy falls outside of § 2254(d)(1)'s requirement that [the Court] defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law."  *Davis v. Secretary for Department of Corrections*, 341 F.3d 1310, 1313 (11th Cir. 2003); *see also Riley v. Cockrell*, 339 F.3d 308 (5th Cir. 2003) (deferential standard of review inapplicable where state court misunderstood nature of claim and therefore did not adjudicate claim on merits).

As previously noted, the state court found: "Defendant has failed to conclusively demonstrate that trial counsel...was ineffective for failure to challenge the admission of

---

(c) If there was at that time a blood-alcohol level...of 0.08 or higher, that fact is prima facie evidence that the person was under the influence of alcoholic beverages to the extent that his...normal faculties were impaired.  Moreover, such person who has a blood-alcohol level...of 0.08 or higher is guilty of driving, or being actual physical control of, a motor vehicle, with an unlawful blood-alcohol level....

The presumptions provided in this subsection do not limit the introduction of any other competent evidence bearing upon the question of whether the person was under the influence of alcoholic beverages to the extent that his...normal faculties were impaired.

Fla. Stat. Ann. § 316.1934(2).

Defendant's blood sample in a particularized legal strategy....[Counsel] properly challenged the admission of Defendant's blood sample through pre-trial motion and cannot be labeled ineffective after failing to prevail." Doc. 6, Ex. O. When the court's holding is read in context, it is clear that the state court did not fail to resolve the merits of the claim but rather determined that the manner in which counsel challenged the blood draw--lack of probable cause--was a "particularized legal strategy" for which counsel could not be faulted simply because he failed to prevail on it. Thus, this Court must defer to that finding unless the decision is contrary to or involves an unreasonable application of clearly established Supreme Court precedent. The Court therefore focuses on the issue of "strategy."

In this case, counsel did not simply choose course A–attacking the blood draw on a lack of probable cause–but he also chose course B–attacking the blood draw based on failure to follow proper protocol. As Petitioner acknowledges, counsel questioned witnesses about the procedures for the blood draw and other pertinent matters, such as the time lapse between the draw and the testing and the need for refrigerating the sample, *see* Doc. 1, Memorandum at 25-26; however, in Petitioner's estimation, counsel was ineffective for not pursuing course C, which was the course taken by the defendant in *State v. Miles*, 775 So.2d 950 (Fla. 2000). In *Miles*, counsel challenged the adequacy of the Florida Department of Law Enforcement (FDLE) administrative rules governing the proper preservation of blood samples drawn pursuant to the implied consent law, leading the Florida Supreme Court to find that "the absence of maintenance standards renders [the FDLE regulations governing the testing of blood samples] inadequate and inconsistent with the purpose of the implied consent law as it relates to ensuring the reliability of test results." *Miles*, 775 So.2d at 955. Thus, because there was no provision in the rule for

preservation of the sample pending testing, the State was not entitled to the statutory presumptions associated with the implied consent law. *Id.* at 953-54.

The *Miles* court reached its decision based in part on *State v. Bender*, 382 So.2d 697 (Fla. 1980). In *Bender*, the Florida Supreme Court, in finding pertinent sections of the implied consent law delegating approval of testing methods to executive agencies to be constitutional, held that "compliance with the statutory mandate for reliable procedures and administrative is essential." *Miles*, 775 So2d at 953. Therefore, the statutory presumptions in the implied consent law did not apply absent compliance with the administrative rules. *Bender*, 382 So.2d at 700.

While Petitioner acknowledges that his trial counsel cannot be faulted for not being clairvoyant (*Miles* was not decided by the Florida Supreme Court until three years after Petitioner's conviction), he argues that *Bender* dictated that counsel file a motion to suppress or in limine to exclude evidence which he knew did not comply with proper protocol. Doc. 1, Memorandum at 26. In other words, Petitioner attacks counsel's representation not only because he did not challenge the administrative rules themselves but also because he did not challenge the blood draw evidence before trial, rather than during trial.

Regardless of how Petitioner shapes these arguments, they synthesize into an attack on the strategic choices made by counsel in defending Petitioner, choices which cannot amount to deficient performance unless they were unreasonable. As to counsel's failure to challenge the administrative rules themselves, the Court believes that the *Miles* court itself answered this question when it recognized that the method of attacking the blood draw evidence in that case was not the usual mode of attack: "Note that this case is different from many others in that the adequacy of the rule itself was challenged at trial, as opposed to the noncompliance with the rule." *Miles*, 775 So.2d at 954 n.4. Since counsel utilized the usual method of attacking blood

draw evidence, i.e., noncompliance with the rules, it is clear that Petitioner cannot show that "no competent counsel would have taken the action that his counsel did take." *Grayson*, 257 F.3d at 1216.

As to Petitioner's argument that counsel should have lodged a pretrial challenge to the procedures actually used to draw and store Petitioner's blood, rather questioning the procedures during trial, the Court is of the opinion that this decision clearly falls within that realm of reasonable strategic choices which is afforded protection from hindsight.  It must be remembered that the test is not what the best lawyers would have done or even what most good lawyers would have done.  Instead, the test is whether a reasonable lawyer could have acted in the circumstances as defense counsel acted.  *Williamson*, 221 F.3d at 1180.  In this Court's view, counsel's actions meet this test.  As Petitioner himself admits, Counsel did not fail to attack the manner that Petitioner's blood sample was handled, transported, and stored.  He just did not mount his attack in the same manner that some other lawyer might have chosen.  Although counsel did not attack Petitioner's blood sample via pretrial motion, it was not unreasonable for counsel to attack these matters through the pertinent witnesses in the midst of trial.  In short, this was a reasonable tactical decision.

II.     Failure to report improper jury contact.

In this ground for relief, Petitioner charges that counsel was ineffective for failing to report juror contact with Petitioner's family during trial.  The facts underlying this claim were presented to the state court as follows:

> After the jury was seated at one point during a break a black female juror came over to where we were standing asked [Petitioner's] parents if he was their son. Then she said, "I know how it feels, my boy is in prison.  You folks got nothing to worry about." [Petitioner's] father related this incident to [trial counsel] immediately.  And on another occasion she started to talk to us, but this time a bailiff caught her and [told] her to move on and not speak to the principles in the trial.

Doc. 6, Ex. P.  Respondent does not contest this version of the events.  While the state court did not find these factual assertions unworthy of credit, it addressed only Petitioner's failure "to bring the potential taint to the court's attention until after the bias did not favor his side," without considering whether counsel was ineffective for not bringing the matter to the court's attention. Although the Court has no basis for questioning the state court's factual determinations and defers to its factual conclusions, its failure to address the claim before it, i.e., whether counsel violated *Strickland*, takes this matter "outside of § 2254(d)(1)'s requirement that [the Court] defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law."  *Davis*, 341 F.3d at 1313.

The Court begins with the following premise:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the jury was harmless to the defendant.

*Remmer v. United States*, 347 U.S. 227, 229 (1954).   Defense counsel has an affirmative duty to bring juror misconduct to the attention of the court.  *United States v. Curry*, 471 F.2d 419, 422 (5th Cir. 1973).  In Florida, "where...the trial court has...been made aware of juror misconduct through a source other than the juror alleged to have caused the jury taint, such information, where corroborated, has been deemed to require the declaration of a mistrial."  *Lebron v. State*, 799 So.2d 997, 1013-14 (Fla. 2001).

Respondent's suggestion that counsel owed no duty to Petitioner to bring the contact to the court's attention is disingenuous.  Counsel had an absolute duty to bring the matter to the court's attention so that his client's right to a fair and impartial trial by a jury of his peers was protected.  Without knowledge of the comment, the trial court could not fulfill its responsibility to the parties to ensure the integrity of the judicial process, as it could neither make inquiries regarding the juror's comment nor take curative action if necessary.  Counsel should have reported the comment to the court and let it decide whether the comment was favorable or unfavorable to his client.  There was no discretion on counsel's part about this point, and no reasonable attorney in counsel's position would have acted as he did.  Thus, counsel's failure to alert the court to the juror's contact was deficient performance, and the Court turns to the question of prejudice.

Respondent argues that Petitioner cannot show prejudice because the "most" he had to gain if counsel had been forthright with the court was a mistrial.  Under Florida law, the declaration of a mistrial was absolutely required if the juror contact was corroborated, and Respondent does not even suggest that the declaration of a mistrial would not have been a different outcome.  But, in this Court's view, to focus only on the verdict is too narrow a view to take.  Petitioner was deprived of more than the possibility of a mistrial: He was deprived of the

opportunity for the court to ascertain whether the panel seated to determine his guilt or innocence was fair and impartial, whether this juror had improperly formed an opinion before submission of the case for deliberation, and whether the jury panel had been tainted in any way by the offending juror's opinions.  This Court is not in a position to determine whether the juror's comment was favorable or unfavorable to Petitioner, and because of counsel's silence, the trial court was not allowed to make that determination in the first instance.  Though the Court cannot say that in the end the verdict would have been different, i.e., that Petitioner would have been acquitted of the charges, it does believe that counsel's unilateral decision to deprive the trial court of the opportunity to exercise a gate-keeping function of this magnitude led to a different outcome in the sense that there is a reasonable probability that, at the very least, the juror would have been replaced with the alternate, and, thus, a different jury with different dynamics would have considered and debated the evidence before rendering its verdict.  As it stood, counsel was well aware that the juror had violated the court's instructions, Doc. 6, Ex. D at 15-16, and his failure to fulfill this duty to his client allowed the trial to continue unabated, which in this Court's opinion, is sufficient to render the proceeding fundamentally unreliable, thereby establishing prejudice.

## CONCLUSION

Therefore, having found that counsel's failure to inform the court of the improper juror contact was deficient, and that this deficient performance prejudiced Petitioner's right to a trial by a fair and impartial jury, Petitioner is entitled to relief.  Petitioner maintains that he "is not requesting a discharge; he is merely requesting a retrial, wherein he is afforded a fair trial."  As retrial is the only relief requested, the Court will recommend that this be the only form of relief granted.  However, if the State fails to retry Petitioner as ordered, the Court should reserve the

right to order Petitioner's discharge from custody and the dismissal of all charges against him.

*See Capps v. Sullivan*, 13 F.3d 350 (10th Cir. 1993) (federal district courts have authority to

dispose of habeas corpus matters "as law and justice require")  (quoting 28 U.S.C. § 2243);

In light of the foregoing, it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus, Doc. 1, be **GRANTED**;

That the State of Florida be **ORDERED TO RETRY** Petitioner within ninety (90) days

after the judgment is entered adopting the Report and Recommendation;

That the Court **RESERVE** the right to order Petitioner's discharge from custody and the

dismissal of all charges against him if the State does not timely comply with the Court's order to

retry.

**IN CHAMBERS** at Gainesville, Florida, this 25th  day of January, 2006.


s/ A. KORNBLUM                                    
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**